*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ILLINOIS NATIONAL INSURANCE CO.,

Plaintiff-Appellant,

UNPUBLISHED
February 26, 2019

v

ALIXPARTNERS LLP,

Defendant-Appellee.

No. 337564
Oakland Circuit Court
LC No. 2014-141526

Before: SERVITTO, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

In this professional liability insurance coverage dispute, plaintiff Illinois National Insurance Company appeals as of right the trial court's opinion and order granting MCR 2.116(C)(10) summary disposition in favor of defendant AlixPartners LLP and denying it the same. We affirm.

## I. BACKGROUND

Plaintiff unsuccessfully sued to recoup the payment of an $18,507,861.92 arbitration award on defendant's behalf in February 2013. After making the payment, plaintiff determined it should not have paid, because the claim was not covered under any of the three professional liability insurance policies it issued to defendant. These policies are referred to in this opinion as: 1) The Tail Policy, 2) Policy 1, and 3) Policy 2. The policy period for the Tail Policy was from February 25, 2006 to February 25, 2007 with an extended reporting period (ERP) from October 12, 2006 to October 12, 2008. The policy period for Policy 1 was from October 12, 2006 to March 15, 2008. The policy period for Policy 2 was retroactive from February 15, 1998 through the ERP of August 30, 2009.

Our resolution of this matter requires an examination of the events that preceded the filing of the claim that resulted in the arbitration award. The award pertained to a claim against defendant made by Kingsbridge Capital, an investment advisor firm headquartered in London. The parties commenced a business relationship on February 28, 2006, when defendant and Kingsbridge entered into a consulting agreement whereby defendant agreed to provide

Kingsbridge support in the due diligence process for its acquisition of Märklin, a model train company headquartered in Germany. On March 24, 2006, defendant issued a due diligence report. Kingsbridge, relying on that report, purchased 100% of Märklin's equity, as well as a significant portion of its debt on May 11, 2006, anticipating the potential turnaround discussed in the report. A few weeks later, on May 24, 2006, defendant entered into a separate agreement with the newly acquired Märklin to provide the company with management services to assist it with its turnaround.

Märklin did not perform as defendant had projected however, and on December 19, 2007, at a meeting of the Märklin advisory board, board Chairman Michel Perraudin, blamed a 3 to 3.5 million Euro loss in Märklin's Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) on defendant's inadequate management. At that meeting, Perraudin also suggested that defendant return part of its management fees to help improve Märklin's bottom line. In letters dated March 7, 2008 and April 21, 2008 from Perruadin to Dr. Ulrich Wlecke, one of defendant's managing directors, Perruadin demanded that defendant waive 50% of its consulting fees, as well as all of its success fees and capital gain participation because Märklin's EBITDA was millions below the projected earnings defendant presented in its due diligence report to Kingsbridge. Defendant responded by letter on March 25, 2008 and April 21, 2008, calling the request absurd and stating that it still expected to be paid the fees owed.

Subsequently, Kingsbridge's counsel, Professor Dr. Wolf-Rüdiger Bub, requested that defendant provide him with the statements and figures defendant relied on in its due diligence report by November 30, 2008. On February 9, 2009, when the documents were still outstanding, Bub wrote to demand their production by February 23, 2009. The documents were received on March 3, 2009. After reviewing those documents, Bub sent a draft arbitration complaint to defendant on July 22, 2009, in which it was alleged that defendant was responsible for Kingsbridge's investment losses on the Märklin acquisition. The draft complaint addressed defendant's breach of duties in preparing the due diligences for Kingsbridge and not any deficiencies in defendant's performance as a consultant to Märklin.

Defendant notified plaintiff of Kingsbridge's claim on August 14, 2009. In response, on September 9, 2009, plaintiff sent defendant a letter that requested a copy of the November 2008 letter from Bub and all other correspondence regarding the claim to determine whether the delivery of the draft complaint to defendant was the first time the claim contained in the draft complaint was made. On October 6, 2011, an arbitration panel awarded Kingsbridge 13,446,000 Euros plus pre-judgment interest. On January 30, 2013, plaintiff agreed to fund the Kingsbridge arbitration award subject to a reservation of rights.

Plaintiff continued to investigate the arbitration matter. Ultimately, after payment of the award plaintiff determined that the Kingsbridge claim was not covered under the policy then in effect, Policy 2, nor under the Tail Policy or Policy 1, because of the policies' "claims first made and reported" language which provided:

> We shall pay on **your** behalf those amounts, in excess of the retention, **you** are legally obligated to pay as **damages** resulting from a **claim** first made against **you** and reported to us during the **policy period** or Extended Reporting Period (if applicable) for **your wrongful act** in rendering or failing to render professional

services for others, but only if such wrongful act first occurs on or after the **retroactive date** and prior to the end of the **policy period**.

Plaintiff argued that "claims first made and reported" policies only covered claims that were both made against defendant and reported by defendant to plaintiff during the policy period or an ERP. Plaintiff concluded that the Kingsbridge claim and the Märklin claim were one in the same claim because they both involved the same wrongful act, i.e. defendant's due diligence concerning the Märklin acquisition. Based on this conclusion, plaintiff decided that the Kingsbridge claim was first made at the December 2007 board meeting or, at the latest, in the March 2008 letter from Perraudin yet, not reported to plaintiff until August 2009 with notification of the arbitration complaint. Plaintiff applied the "claims first made and reported" language of the policy to find that the Kingsbridge claim was not covered because it was not reported to plaintiff when first made in December 2007 or March 2008.

On June 24, 2014, plaintiff filed an action against defendant seeking reimbursement of the arbitration claim it paid. In Count I, plaintiff alleged it was entitled to $19,100,000 in damages plus interest for the claim paid. In Count II, plaintiff alleged that defendant's innocent or negligent misrepresentations, regarding whether and when Kingsbridge first made a demand for money, caused plaintiff to pay the claim. In the alternative, in Count III, plaintiff requested reformation of Policy 2 to reverse expansions in coverage that it granted to defendant that it otherwise would not have granted had defendant not withheld information from plaintiff regarding the December 2007 and March 2008 demands. Lastly, in Count IV, plaintiff requested defendant be estopped from benefitting from or relying on Policy 2, and asserting that plaintiff waived its coverage defense with an untimely determination to deny coverage and that defendant was prejudiced by the delay.

On October 7, 2016, defendant and plaintiff both moved for summary disposition under MCR 2.116(C)(10). Defendant argued that the Kingsbridge claim was covered under Policy 2 because it was first made and reported during the policy period for Policy 2. Defendant further argued that the Kingsbridge claim and the Märklin claim were distinct from each other because the Märklin claim involved a fee dispute. Defendant also asserted that fee disputes were excluded from coverage and that it had no duty to volunteer this information when it was not requested in the policy renewal application. Plaintiff argued that it was entitled to summary judgment on its Count I claim for a declaration that the Kingsbridge claim was not covered under Policy 2 and its Count IV prayer for reformation. The parties' briefs in opposition to the other's motion from summary disposition largely maintained the positions argued in their principal briefs.

After oral argument, the court issued a written opinion and order on March 3, 2017, that denied plaintiff's claims. The court agreed with the defendant that the March 2008 letter was not a claim under "the policy"[1] and was separate from the Kingsbridge arbitration claim; that defendant was not required to submit its fee dispute with Märklin under "the policy"; and that defendant made no misrepresentations to plaintiff in its negotiations for Policy 2. Plaintiff appeals from this decision.

---

[1] The trial court unfortunately did not distinguish which policy.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

We review de novo the trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engg, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). "In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). We only consider that evidence which was submitted to the court at the time of deciding the motion. *Gorman v Am Honda Motor Co, Inc*, 302 Mich App 113, 120; 839 NW2d 223 (2013). "Summary disposition is proper under MCR 2.116(C)(10) if the affidavits and other documentary evidence show that there is no genuine issue concerning any material fact and that the moving party is entitled to judgment as a matter of law." *Kennedy v Great Atlantic & Pacific Tea Co*, 274 Mich App 710, 712; 737 NW2d 179 (2007). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

We also review de novo the legal question of the proper interpretation of an insurance policy. *City of Grosse Pointe Park v Michigan Muni Liab & Prop Pool*, 473 Mich 188, 196; 702 NW2d 106 (2005). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins Co v Kneeland*, 464 Mich 491, 496; 628 NW2d 491 (2001).

### B. ANALYSIS

#### 1. NOTICE

Plaintiff argues that the trial court erred in granting summary disposition to defendant because the arbitration complaint was not the first time that claim was made against defendant. Defendant argues the opposite and contends that the claim in the arbitration complaint was distinct from the Märklin claim because it involved a different contract, parties and request for relief. The trial court agreed with defendant, as does this Court.

"In deciding whether summary disposition was appropriate in the instant case, we must look to some of the basic rules applicable to the construction of insurance contracts." *Allstate Ins Co v Miller*, 175 Mich App 515, 519; 438 NW2d 638 (1989). "An insurance policy is a contract that should be read as a whole to determine what the parties intended to agree on." *McKusick v Travelers Indem Co*, 246 Mich App 329, 332; 632 NW2d 525 (2001). "The contract language will be given its ordinary and plain meaning, rather than a technical or a strained construction." *Wilson v Home Owners Mut Ins Co*, 148 Mich App 485, 490; 384 NW2d 807 (1986). "[E]xclusionary clauses are to be strictly construed against the insurer." *Westen v Karwat*, 157 Mich App 261, 264; 403 NW2d 115 (1987). We also construe any ambiguities in the contract language against the drafter. *Boyd v Gen Motors Acceptance Corp*, 162 Mich App

446, 452; 413 NW2d 683 (1987). "But, where the contract language is clear, unambiguous, and not in contravention of public policy, its terms will be enforced as written." *Miller*, 175 Mich App at 519.

The lynchpin of plaintiff's argument is the assertion that the claims made at the December 2007 board meeting and in the March and April 2008 letters were the same as those made in the Kingsbridge arbitration complaint. There is no dispute that the demands in December 2007, March 2008, April 2008, and the arbitration complaint were claims within the meaning of the applicable policies' definitions of a claim. The Tail Policy and Policy 1 defined a "claim" as "a demand for money or services, including a suit, arising from **[defendant's] wrongful act**." The oral request for the return of fees at the December 2007 board meeting and the written request for the same relief in the March and April 2008 letters were clearly "demands for money" arising from defendant's "wrongful act." In Policy 2, the definition of "claim" was amended to add that the demand for money or services be in writing. The arbitration complaint met the definition of a claim under Policy 2 as "a written demand for money," "including a suit," that arose from defendant's "wrongful act." Defendant's arguments in the trial court and here are based on the contract which by its explicit language excluded coverage of fee disputes regardless of the basis of the dispute.

Even under an argument that the arbitration claim arose from a course of the conduct complained of in the first Märklin communication, the plaintiff's prayer for summary disposition was correctly rejected by the trial court. First, the claims in Märklin's December, March and April letters arose from defendant's mismanagement of Märklin, not advice regarding its acquisition. The March 2008 letter from Märklin's advisory board, which was merely a written reiteration of the December 2007 oral request, complained of Märklin's decrease in value as a result of defendant's poor management and consulting subsequent to the acquisition. In that letter, the advisory board requested that defendant waive success fees for 2006/2007, the capital gain participation that had not yet been paid, and 50% of the consulting fees already paid. The letter provided that if these concessions were made "[w]e would terminate our cooperation after completion of the tasks agreed upon in the fourth addendum of October 10, 2007." The April 23, 2008 letter from Märklin's advisory board amplified those same demands. All of this correspondence related to the May 24, 2006 agreement between the defendant and Märklin and its addenda including the October 10 fourth addendum.[2]

In contrast, the arbitration complaint requested the payment of € 31,975,319 in damages for defendant's failure to execute due care in the preparation of the due diligence report it gave Kingsbridge that induced Kingsbridge to purchase Märklin in the first place. In other words, Kingsbridge was suing Märklin for an investment gone bad. The Kingsbridge arbitration complaint clearly referred to issues specific to the defendant's contract with Kingsbridge in the same way that the March and April letters referred to matters unique to the defendant's Märklin agreement. Under the Kingsbridge contract, defendant prepared a due diligence report that made

---

[2] As an extension of the Märklin agreement, the July 28, 2006 Adler Toy Investment agreement between defendant and Adler Toy Investment, the owner of the Märklin brand, was the only agreement to provide for a capital gain payment.

projections on the future growth and success of Märklin based on defendant's analysis of risks, research of comparable markets, identifiable measures to improve overhead and sourcing, and a restructuring plan implemented by placing defendant's employees in management at Märklin. By its terms, the Kingsbridge agreement ended after defendant filed the due diligence report. Nowhere in their agreement was there a provision for a success fee or for the payment of a capital gain participation referred to in the demands from Märklin. The arbitration complaint was drafted after the projections in the due diligence report failed to come to fruition. Thus, even if the focus was on "wrongful conduct," the disputes concerned very different claims of error.

The basis for the damages awarded in the arbitration was directly related to the investment made by Kingsbridge. In fact, the arbitration complaint specifically excluded any of the claims Märklin had under its agreement with defendant:

> The subsequent consulting services provided to Märklin Holding GmbH and the knowledge required about Märklin Holding GmbH in the scope of these services are significant only insofar as they are indicative of Defendant's breach of duties during preparation of the due diligences. It is only for this reason that reference is made to them. Any breach of duties within the scope of the consulting services provided to Märklin Holding GmbH and any claims for damages resulting from that are not the subject of this lawsuit.

We concur with the trial court's determination that defendant had no responsibility to report the Märklin claims because of the exclusionary language of the contract regarding fee disputes. Plainly read, the March and April letters were claims regarding a dispute of the fees due defendant under the Märklin agreement that defendant was not required to report to plaintiff. All three policies excluded coverage for fee disputes and defined a fee dispute as one arising out of:

> 1. your fees or charges, including over-charges, or cost over-runs;
>
> 2. collecting your fees from third parties;
>
> 3. the return of fees or other compensation paid to you; or
>
> 4. your cost of correcting or re-performing or completing any professional services;

Plaintiff's professional liability claims representative Lawrence Fine testified that the fee disputes' provision ideally concerned "a claim that we'd like our money back or we think you charge too much." Kingsbridge's corporate representative Mathias Hink testified that the March 7 letter's request for a waiver or return of fees was based on the investors' beliefs that the services "provided were not good enough to justify the fees," the fees were inflated, and were taken without success. The Tail Policy excluded from coverage claims arising out of disputes involving defendant's fees or charges, including collecting fees and "the return of fees or other compensation paid to [defendant]." We reject plaintiff's argument that defendant should have reported the December, March and April fee dispute claims despite the fact that they would not

have been covered under the Tail Policy. Plaintiff specifically excluded this type of claim from coverage.

## 2. AGENCY

Plaintiff additionally argues that the March and April letters were actually claims on behalf of Kingsbridge because Perraudin was acting on behalf of Kingsbridge when he authored the series of advisory committee demands. We first note that Perraudin had no written authority to act as Kingsbridge's agent and that he signed the demand letters on behalf of Märklin's advisory board only. Hink testified that the advisory board did not have the authority to make a demand on Kingsbridge's behalf. He also testified that the March and April letters both referred to Märklin, not Kingsbridge claims. Thus, there is no record support for Perraudin having had actual authority to act as an agent of Kingsbridge.

Plaintiff's assertion of apparent agency also fails. Apparent agency arises when "a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in [sic] behalf of the principal." *Mossman v Millenbach Motor Sales*, 284 Mich 562, 567; 280 NW 50 (1938). That assumption "must be generated by some act or neglect of the principal sought to be charged." *Grewe v Mt Clemens Gen Hosp*, 404 Mich 240, 252-253; 273 NW2d 429 (1978) (citation omitted); *Echelon Homes, LLC v Carter Lumber Co*, 261 Mich App 424, 431-32, 683 NW2d 171 (2004) (discussing ratification), rev'd on other grounds, 472 Mich 192; 694 NW2d 544 (2005); *Hutton v Roberts*, 182 Mich App 153, 162; 451 NW2d 536 (1989) (same). Furthermore, apparent agency is established when the principal does nothing to dispel that apparent agency. *Smith v Saginaw Sav & Loan Ass'n*, 94 Mich App 263, 273; 288 NW2d 613 (1979).

The plaintiff bases its claim of apparent agency, in part, on the fact that defendant generated numerous documents including agendas, letters and other correspondence in which it listed "Märklin/Kingsbridge" as a twinset in discussions regarding both contractual entities. This is offered in support of a claim that a reasonable and prudent entity actually perceived that there was apparent agency; it is unpersuasive. There is no direct testimony from any witness associated with the defendant, the insured, (or any other alleged prudent observer), that at the time of this correspondence, Perraudin was perceived to be Märklin's agent, nor can such an inference reasonably be drawn from the contents of the correspondence. The correspondence the plaintiff uses to support its' claim of apparent agency discussed the fiscal plight of Märklin, in which Kingsbridge had invested heavily, and referenced the need for the investment to be more profitable to Kingsbridge. The interests of the two entities were necessarily intertwined by economics. There was no evidence that a reasonable and prudent entity perceived that Perraudin had apparent authority to act on behalf of Kingsbridge, and nothing in the record supports such an inference.

Plaintiff also asserts that conduct during the negotiations, after the Märklin advisory board had sent its demands and Kingsbridge raised its complaint about the due diligence, support apparent agency. Specifically, plaintiff's requests to meet with Kingsbridge were rebuffed with correspondence that asserted, "We prefer to have the US company take the lead." At the point at which this correspondence occurred both disputes were joined, one via demand for recoupment and the other via draft arbitration. In fact, during negotiations after the arbitration complaint was

filed, there were discussions of payments going not to Märklin, which was headed toward dissolution, but to Kingsbridge. At best, this provides evidence that there was apparent agency to negotiate the separate claims.

Looking to the activity that occurred leading to Kingsbridge's arbitration claim, Fine testified that he assumed that Perraudin had authority to act on Kingsbridge's behalf because of the reference to the due diligence activity and the fact that the advisory board demand letters were copied to Kingsbridge employees. There was, as discussed before, a logical connection to Märklin's need to improve its fiscal health as an investment of Kingsbridge and the fact that the defendant had projected a profitable picture which induced the investment. Nowhere in that correspondence did Märklin make demands on behalf of its investor. The act of providing copies of the correspondence is also unavailing. The March letter was copied to the advisory board and Steffen Lehmann. The April letter was copied to the advisory board, Wlecke, Michael Grindfors and Stefano Aversa. Wlecke, Grindfors and Aversa were all managing directors of defendant. Consequently, Lehmann was the only Kingsbridge employee copied. Lehmann however, was a junior employee at Kingsbridge who was assigned the task of reviewing in detail the fees claimed by defendant and would then report to Hink and Florescu. The fact that Lehmann was copied on a letter discussing a success fee made sense given his responsibility. It is not reasonable to conclude that copying the April letter to Lehmann implied that Perraudin had authority to write on Kingsbridge's behalf. The fact that the April letter had details of the past dealings between Kingsbridge and defendant was also not an indicator that the letter was written on Kingsbridge's behalf. Apparent agency cannot be based upon the subjective perception of the party asserting its existence. *Howard v Park*, 37 Mich App 496, 500-501; 195 NW2d 39 (1972) (citations omitted). Instead, the alleged principal must have acted in-some way to create the appearance of authority in the alleged agent. *Id*. The passive receipt by Kingsbridge of correspondence does not support apparent agency. The post arbitration negotiations cannot create an agency claimed to have existed years before the negotiations.

Given this evidence, it was not erroneous for the trial court to conclude that the first time the Kingsbridge claim was made was in the arbitration complaint. Plaintiff does not dispute that the arbitration complaint was reported as a claim during the automatic ERP for Policy 2. Finding no error in the court's determination as to when the claim was first made, we affirm the trial court's finding that the Kingsbridge claim was covered under Policy 2.

## III. REFORMATION

### A. STANDARD OF REVIEW

Reformation is an equitable action, *In re Rhea Brody Living Tr*, 321 Mich App 304; 910 NW2d 348 (2017), that this Court reviews de novo, *Burkhardt v Bailey*, 260 Mich App 636, 646-647; 680 NW2d 453 (2004). "Whether a grant of equitable relief is proper under a given set of facts is a question of law that this Court also reviews de novo." *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 371; 761 NW2d 353 (2008).

## B. ANALYSIS

Plaintiff argues it is entitled to reformation based on unilateral mistake where defendant was aware of a possible claim in the March 7, 2008 letter and withheld that information from plaintiff while negotiating the terms of Policy 2, to plaintiff's detriment. "Michigan has long recognized that an agreement may be reformed because of a unilateral mistake that was induced by fraud." *Johnson Family Ltd Pship*, 281 Mich App at 380. Such equitable relief is in order when "one party to an instrument has made a mistake and the other party knows it and conceals the truth from him." *Barryton State Sav Bank v Durkee*, 325 Mich 138, 142; 37 NW2d 892 (1949) (citation omitted). From the same allegations, plaintiff argues negligent misrepresentation. Negligent misrepresentation "requir[es] proof that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 30; 436 NW2d 70 (1989).

Plaintiff's argument for reformation is dependent on a finding that the March 7, 2008 letter was a claim that defendant was required to report under Policy 2. Plaintiff argues that a requirement to report arose from the following language in the March 4, 2008 insurance quote for Policy 2: "This quote is strictly conditioned upon no material change in the risk occurring between the date of this letter and the inception date of the proposed policy." Plaintiff contends this language established a duty for defendant to supplement its renewal application for insurance. We disagree. Again, the March 7 letter involved a fee dispute. Fee disputes were excluded from coverage under Policy 2, as well as under the Tail Policy and Policy 1, therefore, a duty of complete disclosure did not arise. Further, plaintiff fails to provide an explanation as to why an uninsured claim need be reported and how a claim that plaintiff would not be responsible to cover under the policy would materially change the risk for those claims that it contracted to cover. Additionally, in *Federal Land Bank of St Paul v Edwards*, 262 Mich 180; 247 NW 147 (1933), our Supreme Court held that an insured is not required to disclose information not requested by its insurer:

> The insured may not be held to have fraudulently concealed a fact that the insurer never inquired about. And where the insurer propounds questions to the applicant, and he makes full and true answers, he is not answerale [sic] for an omission to mention the existence of other facts about which no inquiry is made of him, though they may turn out to be material for the insurer to know in taking the risk. The insurer is assumed to know the extent of the information desired, and to seek it, and cannot avoid liability by claiming there was concealment of the fact of foreclosure when it did not ask about such a matter and called for no such information in its written application. There was no fraudulent concealment. [*Federal Land Bank of St Paul*, 262 Mich at 184-185 (citation omitted)].

Plaintiff's failure to show defendant was required to disclose the March 7 fee dispute defeats its claim of concealment. Further, plaintiff does not identify any question in the application that was fraudulently answered by defendant. Accordingly, the court's decision to deny plaintiff reformation of the terms of Policy 2 was not erroneous.

## IV.  ESTOPPEL

### A.  STANDARD OF REVIEW

Estoppel is an equitable action, *Kamalnath v Mercy Mem Hosp Corp*, 194 Mich App 543, 551; 487 NW2d 499 (1992), that this Court reviews de novo, *Burkhardt*, 260 Mich App at 646-647.  "Whether a grant of equitable relief is proper under a given set of facts is a question of law that this Court also reviews de novo." *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 371; 761 NW2d 353 (2008).

### B.  ANALYSIS

Plaintiff argues that defendant should be estopped from claiming coverage for the Kingsbridge arbitration settlement under Policy 2 when defendant only gained coverage of that claim by intentionally concealing the demands made in the March and April 2008 letters, the November 2008 letter from Kingsbridge's counsel, and not complying with the obligations of the insurance quote for Policy 2.  Plaintiff contends that while concealing this information, defendant negotiated for the removal of the Investment Advisor Exclusion thereby obtaining coverage for claims against defendant arising from defendant's investment advice, i.e. the Kingsbridge claim.

"The principle of estoppel is an equitable defense that prevents one party to a contract from enforcing a specific provision contained in the contract." *Morales v Auto-Owners Ins Co*, 458 Mich 288, 295; 582 NW2d 776 (1998).

> Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts. [*W Am Ins Co v Meridian Mut Ins Co*, 230 Mich App 305, 310; 583 NW2d 548 (1998)].

"Silence or inaction alone is insufficient to invoke estoppel absent a legal or equitable duty to disclose." *Tenneco Inc v Amerisure Mut Ins Co*, 281 Mich App 429, 446; 761 NW2d 846 (2008).

There is no evidence that defendant negotiated the specific terms of Policy 2 in order to gain coverage of the Kingsbridge arbitration claim.  The defendant's policy renewal negotiations occurred before receipt of the March 7 letter.  On January 17, 2008, defendant's counsel had an independent firm, Foley & Lardner LLP, review and provide comment on defendant's multiple insurance policies in connection with defendant's policy renewals.  The firm had 24 comments regarding alternative coverage options under defendant's policy with plaintiff.  One of those comments was "By endorsement, coverage is excluded for providing investment advice, or selecting an investment manager or advisor or an investment custodial firm.  Does AlixPartners provide any such advice?"  E-mails in the trial court record indicate that defendant's employees met to discuss defendant's options regarding coverage for investment advising after the receipt of the Foley report.  Defendant filed its application for insurance renewal with plaintiff on February 7, 2008.  Plaintiff provided an insurance quote on March 4, 2008.  Defendant had its independent risk management firm MARSH prepare a March 6, 2008 professional liability

renewal update report comparing underwriters for plaintiff's policies, Chubb and ACE USA. The report recommended that defendant renew its policy with plaintiff. On March 15, 2008, Policy 2 began. There is no evidence that the March 7 letter was a factor in the negotiations for Policy 2. Defendant was also under no obligation to report the March or April letters, again because they represented claims not covered under Policy 2 and were an uninsured risk for purposes of the insurance quote's obligation. As for the November 2008 letter from Bub, it was merely a request for the sources of information used to form "detailed statements and specific figures" in the Kingsbridge due diligence report so they could be verified. Under this set of facts, estoppel was not warranted.

Plaintiff additionally argues defendant should be estopped from arguing plaintiff waived "coverage defenses" because plaintiff at all times maintained a reservation of rights. Plaintiff also acknowledges that this contention was only "hinted at" by defendant and ultimately "disclaimed." Because defendant did not actually argue this issue at the trial level, nor address it effectively on appeal, plaintiff's request for equitable relief on this ground is either moot[3] or unripe[4] for this Court's review.

Affirmed.

/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens

---

[3] "An issue is moot if an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy." *Gen Motors Corp v Dept of Treasury*, 290 Mich App 355, 386; 803 NW2d 698 (2010) (citation omitted).

[4] "The doctrine of ripeness is designed to prevent the adjudication of hypothetical or contingent claims before an actual injury has been sustained. A claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *City of Huntington Woods v City of Detroit*, 279 Mich App 603, 615-616; 761 NW2d 127 (2008) (citation and quotation marks omitted).